Carroll,
March 6, 1934.

GOODRICH FALLS ELECTRIC CO. *v.* GRANVILLE K. HOWARD & *a.*

514

*Arthur E. Kenison, Laurence I. Duncan* and *Robert W. Upton* (*Mr. Duncan* orally), for the plaintiff.

*Arthur A. Greene* and *Demond, Woodworth, Sulloway & Rogers* (*Mr. Franklin Hollis* orally), for the defendants.

ALLEN, J. For convenience the questions are not answered in their order. Also, the separate consideration of some of them is rendered undesirable and inexpedient by their interdependence. The issues presented rest in part upon the same or related principles for their decision.

I. The article in the warrant for the precinct meeting gave sufficient notice of a vote to acquire the plaintiff's property by eminent domain. It was of a vote to acquire or establish. Acquisition is taking with or against consent. Another article relating to the rais-

ing of money to pay for the cost of "purchasing or taking" the property confirms the full scope of meaning of the first article to comprehend both methods.

The motion voted on under the article provided for action under Public Laws, c. 44, in the event of disagreement as to price, as well as for taking the property. It could hardly be more explicit to show that taking by condemnation was contemplated as well as taking by agreed purchase.

II. The vote of the precinct was to take the plaintiff's property within the precinct limits and such part of it outside the limits as the public service commission determined to be for the public interest. It is possibly defective through non-compliance with the procedure outlined by statute.

When a municipality takes the property of a utility, it "shall" take all of it within its limits, subject to some qualifications. P. L., c. 44, s. 12. The utility's property outside the municipal limits "may" be taken so far as the public service commission determines it to be for the public interest. *Ib.*, s. 13. The difference in the two sections may be intended to be of contrast between command and permission, or it may be but a matter of verbal unimportance.

If it is permissive, the section relating to outside property contemplates an option for the municipality whether or not to take after the public service commission has determined the outside property that may be taken. Under the permissive view, the commission's action shows if and how far the municipality may acquire such part of the utility's property. After it acts the municipality may then decide if it will take what the commission has determined it may take. The decision of public interest resting with the commission, no taking is authorized until the interest is found.

No decision of the mandatory or permissive construction of the section is here necessary and none is made. Notice of the doubt about it is taken without expression of opinion.

III. The act permitting the formation of the precinct (Laws 1931, c. 302) is attacked on the ground that it delegates legislative duty. The decision whether the act may be brought before a meeting of the precinct for acceptance being left to other municipalities, it is argued that the legislature has thereby undertaken to place upon them a duty only performable by itself. The exception as to matters of local government is acknowledged, but its application here is disputed.

It is not clear if the plaintiff also relies upon the preliminary action of the selectmen of the towns in which the precinct is located in fix-

ing its boundaries "as may seem to them convenient," as a part of its claim of improper delegation of legislative duty. If it does, the claim is briefly answered.

The layout is in all respects of the same legal character as the layout of a highway. The bounds of the precinct must be first defined in order to determine who may vote upon the acceptance of the grant. The layout is an exercise of duty ordered by the grant and not a part of it. The order is no different in valid character than one in an act which sets up a tribunal to take property by eminent domain. It belongs in its execution to the general administration of government and is always recognized as a subject of delegation. The board of layout here were the representatives of bodies which were interested, as will hereafter appear.

Upon its main contention that some part of the delegation of power is to other municipalities than the one affected, the plaintiff's position loses recognition of the local interest they have at stake. The precinct covers an area including parts of Bartlett and Conway. The act, omitting irrelevancies, requires Bartlett and two lighting precincts in Conway to hold separate meetings and vote in approval of the formation of the precinct before it may vote upon acceptance of the act. It is understood that the area of the precinct in Conway is substantially that of these two lighting precincts. The general purpose of the act appears to be to permit their union with some part of Bartlett added, thus to form a single district for owning and operating an electric power plant.

The public bodies whose consent was to be obtained were directly concerned. The town of Bartlett by consenting permitted a burden of debt and taxation upon a part of its territory in addition to its own debt and taxes. The part of the town outside the precinct had an important and substantial interest in this respect, if not in others. It related to local government. If also it did not have an interest in a lighting precinct to be wholly within its own confines, the two existing precincts in Conway were each in virtual effect to surrender their purpose of establishing separate lighting plants if the defendant precinct was to be formed. The new precinct indicated a fundamental effect upon their functions and their interest was in commensurate proportion with that of the new body itself.

The approving bodies were affected by a new entity superimposed upon their territory in part or whole. Practically, it limited their own fields of governmental activity. The situation was such that the pressure of economic considerations would take from them any

opportunity of reasonable character to engage in the municipal functions permitted the grantee of the charter. Its assumed gain would be their assumed loss in respect thereto. A transfer of the exercise of local powers was an almost certain outcome, if not a legal direction. The outcome gave the consulted bodies an actual interest of substantial force in the legislation. The act recognizes the various parties in interest. Giving them the right to be consulted was not a transfer of non-delegable power.

". . . the Legislature does not in any sense delegate its constitutional authority, but, in the exercise of that authority, determines that, if the inhabitants of that part of the state to be immediately affected by the proposed change assent to it, public policy requires it to be made, and that, without such assent, the other considerations offered in support of it are not sufficient to justify its adoption by the Legislature." *Stone* v. *Charlestown*, 114 Mass. 214, 221.

Viewed in this aspect, the act was a charter complete and final in itself. Before it could be accepted and the grantee permitted to act under it other local bodies were to consent to the acceptance. The legislative decision was that the permission should be given provided these bodies agreed to it. Their interest was thought to be of enough importance to make their consent a condition of permission.

The act is legally parallel with nine of the ten city charters granted by the legislature and requiring acceptance by the voters of the town or towns whose territory became that of each city, before the charters became effective. The original charter of Manchester (Laws 1846, c. 384, s. 4) established eight wards with authority of the city councils to change their boundaries or increase their number. Bearing on this, in *Charter of Manchester*, 47 N. H. 277, 279, the court said: "But we cannot doubt that the legislature have the power and the right constitutionally to grant charters for cities, and the practice has been in this State to authorize them to divide themselves into wards, . . ." The practice also received sanction in *Attorney-General* v. *Shepard*, 62 N. H. 383.

The general law authorizing the formation of village districts (P. L., c. 57) contains no requirement for antecedent consent of the town or towns in whose territory the district is established. The justice of the requirement is clear. It would be an anomalous result if the enactment of the requirement, in furtherance of justice, were the turning point making the special act invalid while its omission in the general act secured validity.

The factor of interest pertaining to local governmental administra-

tion is clear, and the conclusion reached is not in conflict with *State v. Hayes*, 61 N. H. 264, in which the exception of local legislation from the bar of delegation receives extensive discussion. The discussion is summarized in the opinion (*p.* 328) in this approved citation from *Clarke* v. *Rochester*, 28 N. Y. 605, 633: "But while general statutes must be enacted by the legislature, it is plain the power to make local regulations, having the force of law in limited localities, may be committed to other bodies representing the people in their local divisions, or to the people of those districts themselves. Our whole system of local government in cities, villages, counties and towns, depends upon that distinction. The practice has existed from the foundation of the state, and has always been considered a prominent feature in the American system of government."

The plaintiff seems to argue that this exceptional power to delegate legislative authority should receive narrow adoption. The tendencies towards centralization of governmental control are observed, but they have as yet assumed inadequate force to entitle them to recognition as a judicially established public policy. And in no measure may they be judicially employed to limit the constitution's sway. The law knows no policy against its security and maintenance.

IV. The action of the precinct upon its vote to acquire the plaintiff's property is challenged as an unconstitutional exercise of the power of eminent domain. The legislation (P. L., *c.* 44, *ss.* 9, 11) effects a transfer of the property condemned before payment therefor when its value is in dispute, and the plaintiff asserts that it has no proper security for payment upon final determination of the value. A confiscatory character inhering in the legislation is thus argued. The proposition is advanced that while the precinct is sure to take, the owner is not sure of payment.

The legislation needs but brief examination to show its allowance, in cases of disagreement about the price, for an interval of time after the taking and before payment is due that may become protracted. Possesson and title are to be transferred within 120 days after the final vote to acquire the property. *s.* 11. The public service commission tries the issue of value in the first instance. Either party may appeal from its finding to the superior court, where the issue may be tried *de novo* by jury. *s.* 9. Questions of law arising in the jury trial may be transferred to this court. The nature of the issue and the normal course of time taken both before the commission and in the superior court in the disposal of controversies unite to indicate

in litigation contested to the end a real and substantial deprivation of compensation after loss of possession and ownership.

The delay in payment would amount to partial confiscation if compensation for it were not allowed. Payment of value when ascertained is less than its payment when the property is taken, and payment of less than value is a denial of compensation. But adjustment for the delay through the allowance of interest or of additional value is a well established right by which the required measure of full value will be attained. The final judgment will include an amount to represent the element of delay. *Wentworth* v. *Portsmouth*, 68 N. H. 392; *Newmarket Electric Co.* v. *Chase*, 79 N. H. 280.

But the inquiry remains if the owner, as matter of law, is presently secured for his future payment of compensation with due promptness when its amount is finally adjudicated. Constitutional limitations in the exercise of the right of eminent domain demand such security. Eminent domain is not an express constitutional right. It is an incident of sovereign power and authority. The constitutional issue is how far it has been restricted.

The clause of the state constitution which forbids the compulsory taking of private property for public uses except by legislative authority (Const., *art.* 12) has always been construed to deny the authority unless provision is made for compensation in its exercise. The same clause establishes the right of protection in the enjoyment of one's property, and "an equal property right is so specifically guaranteed in the bill of rights that it necessarily limits all subsequent grants of power to deal adversely therewith." *Eyers Woolen Co.* v. *Gilsum*, 84 N. H. 1, 21. "Confiscation, either total or partial, not being law in the constitutional sense, is not authorized . . . ." *Opinion of the Justices*, 66 N. H. 629, 634. The principle is too firmly embodied in our law to summon further references in its vindication. And the fourteenth amendment to the federal constitution depriving a state of power to take private property without due process of law differs only in phraseology from that of the state bill of rights in its substantial restraint of confiscation. By both documents compensation for taking is a requirement.

Compensation is payment for value in money. When the taking is by the state or one of its subdivisions, the payment need not be made until its amount is determined provided it is secured so that payment will then be made with reasonable certainty. ". . . the requirements . . . are fully met where the statute makes such provision for reasonable compensation as will be adequate and certain

in its results. ... adequate provision is made when the statute, authorizing a public municipal corporation to take private property for public uses, directs the regular ascertainment, without improper delay and in some legal mode, of the damages sustained by the owner, and gives him an unqualified right to a judgment for the amount of such damages which can be enforced, that is, collected, by judicial process." *Sweet* v. *Rechel*, 159 U. S. 380, 482. "Indisputably the duty to make compensation does not inflexibly, in the absence of constitutional provisions requiring it, exact, first, that compensation should be made previous to the taking—that is, that the amount should be ascertained and paid in advance of the appropriation—it being sufficient, having relation to the nature and character of the property taken, that adequate means be provided for a reasonably just and prompt ascertainment and payment of the compensation; second, that, again always having reference to the nature and character of the property taken, its value and the surrounding circumstances, the duty to provide for payment of compensation may be adequately fulfilled by an assumption on the part of government of the duty to make prompt payment of the ascertained compensation —that is, by the pledge, either expressly or by necessary implication, of the public good faith to that end." *Crozier* v. *Krupp*, 224 U. S. 290, 306.

The dissenting opinion in *Orr* v. *Quimby*, 54 N. H. 590 does not stand for the proposition that payment may not be subsequent to the taking in constitutional legality. Judge *Doe's* view was that the statute there invoked was in one respect defective because it made "no provision for compensation or security." *p.* 604. Again, "The seizure of his [the plaintiff's] property, without payment, or legal security, or legal obligation to pay, was a transaction that lacked an element essential to the legal idea of a [compulsory] purchase." (*p.* 639.) And again, "... compensation, if it cannot be made when the property is taken, requires security to be given." (*p.* 643.)

It thus appears that while payment need not always be made when the property condemned is taken, yet, when it is deferred, there must be an equivalent of payment in the form of security or obligation which in reasonable certainty will produce payment with due promptness. If eventual payment is in any fair way uncertain, the right to it is not the equivalent of present payment. Briefly, the payment must be insured. *Dohany* v. *Rogers*, 281 U. S. 362, 366. Treating eminent domain as a power to enforce a sale, the owner is not obliged to sell on credit unless the credit is equal in value to the value of the

property taken from him. He must be as well off in terms of money as though payment took place upon the transfer of the property. His claim for payment must be worth the amount eventually payable.

The defendants say that the occasion to take the plaintiff's property immediately and the unavoidable delay in determining the price to be paid for it create a right, under legislative authority, to take in advance of payment, on the plausible plea that "The orderly processes of government must go on." The adoption of the proposition would contravene the constitution if such processes are those of unrestricted legislative determination. If they are of constitutional measurement, the proposition is of no aid. The constitutional guaranties are to be interpreted under the rule of reason. They are broad and general in statement but sweepingly inclusive. The normal exigencies of government are matters of practical relevance to be given consideration. But the guaranties do not yield to them. The government has no needs of action in violation of the constitution. There is no lawful test of orderly processes other than conformity therewith. The limitations upon legislative power are for the general welfare and so long as they remain in force, legislation disregarding them is adverse to the public interest. The presumption that the legislature observes this principle is a rule of construction only. The motive of the presumption is to sustain legislation by subordinating it to the constitution and not to give it overriding force.

The exercise of regulation under the police power is authorized and is no invasion of secured property rights. The line between regulation and invasion is a subject of endless conflict in specific application, but the distinction is of unfailing judicial observance. Regulation of property is in its protection, if sometimes more incidentally than directly so, and without infringement upon protection or in impairment of it the law of eminent domain may include features of a regulatory character. Beyond that it may not go.

The owner's rights of property are entitled to protection against taking by the public as much as by individuals. The guaranty is that the body public will respect them as well as its members. A municipality is not endowed with credit merely because the legislature has authorized the debt for which it seeks credit. A rule of law that the credit may not be questioned in this connection is invalid, whether enacted by statute or declared judicially. The constitution by necessary implication requires credit as a substitute for payment to be definitely certain. There is no other test. If municipal credit is. generally beyond reproach, so that it may be said with certainty

that the municipality's liability to pay its debts is the equivalent of their payment, it is because it is the fact and not because the law thus rates it. The presumption of the validity of legislation is given full respect. But authority to incur debt is no evidence in proof of ability to pay it.

Again, the expense of government in its ordinary needs is fairly to be regarded as more important than that for projects which may be indifferently operated publicly or privately. Utilities such as water works and electric plants are more allied to business than regular governmental functions. They require large capital investment, for which the legislature makes allowance in authorizing the issuance of bonds to be sold to pay for them. A debt limit of 1% of the last assessed valuation is fixed for village districts, but without including debts for water works or incurred under authority of special acts. P. L., c. 59, s. 7. A limit of 10% of property valuation is placed on the defendant precinct in its special issue of bonds for acquiring its electric plant and enterprise.

When a utility is privately operated, property condemned for it must be paid for by the time of taking. If it is publicly operated, the owner may not have the right to a like payment. But his right to security of payment does not depend upon discriminations between public and private debtors. The constitution in its implications forbids them. The private debtor may be placed under restrictions not imposed upon the public debtor, but the latter is not thereby given some favor by the constitution which it denies the former. The distinction is a convenient one adapted to respect but not to thwart the constitutional order. It is not rigid, and when its application fails, both public and private credit should be treated alike. The law may give more protection through regulation than the constitution guarantees; but it may not weaken or lessen the force of the guaranty.

A rule of law that all public credit undoubtedly gives security conflicts with the guaranty of protection. A rule that all private credit is doubtful tends to serve the guaranty. If the rule is not to be extended to apply to public credit, yet the business undertakings of government are analogous to like undertakings conducted privately, and the public credit in respect to them may be less than that employed for the discharge of other governmental functions. It is a factual item for consideration.

The duty to protect the owner calls for a rule in a public taking that payment must not be postponed beyond the taking unless the amount of payment is then unascertained and unless there is reason-

able certainty of prompt payment upon the ascertainment of its amount. The issue of equivalence of payment is in the first instance one of fact. But the finding of equivalence must be one of reasonable certainty, and the issue whether it may be thus found is here presented to be treated as one of law. Equivalence is not secured if certainty of it may not be a reasonable opinion and belief.

A rule that a taking is constitutional because payment will probably be made does not adequately support the guaranty of protection. The guaranty is not sustained if compensation fails. Absolute certainty would mean that payment must never be deferred after the taking. *Orr* v. *Quimby*, 54 N. H. 590, 594, 600. But reasonable certainty of payment gives the claim for it full value, and the owner thus acquires full compensation upon the taking. If he does not have money, he is entitled to what is clearly and readily money's worth. It should be as safe for its full amount as money on deposit in a bank of whose solvency there is no question. If not then in the form of money, it is in a form of equivalence which satisfies the right of protection.

Reasonable certainty is more than a balance of probability. Probability of payment falls short of giving to the claim for it definite equivalence of value. Less than certainty of payment means less than guaranteed protection. The evidence that payment will be made must be conclusive in the sense that there can be no doubts about it which make it uncertain. Doubts reasonably entertained and creating uncertainty in a fair sort of way tend to discount the value of the claim for payment. All will admit that payment by the time of taking may be more certain than through the right of a later enforcement of a judgment for the sum to be paid. While a claim against a solvent debtor is usually worth its amount, its postponement of payment to an indefinite future date with uncertainty as to the debtor's continued solvency may make it worth only a fraction of its finally ascertained amount.

The standard of reasonable certainty for the sufficiency of proof of equivalence is believed to be employed in all jurisdictions subject to the constitutional mandate to observe the right of protection. In our own state it was given definite recognition in *Orr* v. *Quimby, supra,* 601, in this statement: "It is clear that, in cases in which it is impossible to ascertain the amount of damages in advance, a reasonable certainty of payment is all that should be required . . . . Perhaps the question to be determined really is, whether the prompt payment of compensation under this statute is reasonably certain . . . this seems

to call for a conclusion . . . of fact rather than upon a question of constitutional law. Upon that question we cannot doubt . . . . It is as certain, for aught we know, as prompt payment of fees to jurors or witnesses on behalf of the government." Reference to a few of the authorities elsewhere is sufficient. " . . . the owner is entitled to reasonable, certain and adequate provision for obtaining compensation before his occupancy is disturbed." *Cherokee Nation* v. *Railway*, 135 U. S. 641, 659. " . . . the remedy . . . affords . . . a reasonable certainty" of payment. *Brickett* v. *Company*, 142 Mass. 394, 397. "It is enough if an adequate and certain remedy is provided . . . This means reasonable legal certainty." *In re Petition of United States*, 96 N. Y. 227. " . . . some provision must be made for compensation whereby the owner will certainly obtain it . . . ." Lewis, Em. Dom. (3d *ed.*), *s.* 679, cited with approval in *East Shore Land Co.* v. *Peckham*, 33 R. I. 541.

The statute here permitting taking before payment is valid. The rule that legislation is to be sustained if it may be read so as to be, has application. As a rule of construction a presumption is employed that the legislature intends to enact no invalid laws, and laws enacted are construed under that presumption. The interpretation of the constitution and the construction of legislation both being judicial functions, a meaning is given legislation, if its wording reasonably permits, which conforms to the constitution as interpreted.

Since the statute is valid only in situations where it may be given constitutional enforcement, it is to be construed as inapplicable to cases where to enforce it would transgress the constitution. Such an enforcement is to be presumed not to be in its contemplation, and it is construed accordingly. Its purpose of adherence to the constitution qualifies and limits the application of its terms, although they do not expressly state the limitation.

The inquiry therefore is whether the situation here presented is included within the scope of the statute and controlled by it. Taking before payment is valid if the unascertained payment is duly secured, but not otherwise. Hence the statute operates when the payment is thus secured, and not in cases where the security is insufficient. It applies to municipalities whose credit at the time of taking is of such strength that security for payment is the equivalent of payment. It does not apply to them when they are deficient in such credit. The circumstances of security are to be examined in each case in order to determine if they afford the owner the protection he is entitled to. `

When the statute makes no provision for security in other forms

than credit to supply any deficiency of security, the owner is not required to accept other security which may be offered. Payment of the award must be secured and the authority to take must arrange for sufficient security if payment is to be deferred. There must be provision for compensation in the statute itself. The public money may not be expended or its liability imposed except as statutory authority may prescribe. *Piscataqua Bridge* v. *Bridge*, 7 N. H. 35, 65, 66; *Ash* v. *Cummings*, 50 N. H. 591, 613, and cases cited.

The precinct, by the act providing for its formation, may raise money to pay for the property taken by taxation or by borrowing, the borrowing not to exceed 10% of its last assessed valuation. For further security, all of the property belonging to the precinct and within its limits is subject to levy of execution to satisfy the judgment upon the final award to the plaintiff, under prescribed proceedings. P. L., *c.* 346. The issue arises whether due payment can be found reasonably certain upon the security thus arranged and furnished.

The precinct, with an assessed valuation in 1933 of about $2,000,000, proposes to acquire property for which the plaintiff asks $465,000. The defendants have had it appraised with a resulting figure of $140,000. The difference and the amount at stake forecast a period of some years for the value to be determined by litigation before the authorized legal tribunals, under a normal course of progress. When final judgment is rendered, the property of and within the precinct, including that sought to be acquired, will have a value which under existing conditions may now be only conjecturally estimated. No evidence of the nature and kind of property within the district is disclosed by the record. It may in part or whole substantially decline in value. It may be charged with town, school district, or other precinct indebtedness. The history of falling values in the past five-year period and the present uncertainty how far present values will be maintained without further impairment give no assurance of firm stability. The view ahead is not very clear for very far.

When the time comes for payment, how far the precinct will then exercise its optional right to issue bonds within the permitted limit and how far the exercise of the right will raise funds for the payment of the judgment, are inquiries to be given problematical answers. The chance of the need of taxation for some amount burdensome to the taxpayers is a reasonable one. The burden of normal taxes is heavily felt in many of our communities. Insufficiency of the proceeds of bonds and a tax assessment would leave the plaintiff to look

for payment of the balance of its claim through levy upon the property of the precinct and its inhabitants. The proceedings would be technical and attended with expense. They are hardly to be regarded as adapted to furnish prompt payment.

The authority to issue bonds does not furnish the required proof of their sale at a price which, with resort to other ways and means of raising money, will produce a fund adequate duly to meet the liability. The fulfillment of payment promptly cannot be judicially established. Certainty in a fair way fails as an attribute of any conclusion. Whatever may be said of municipal credit for debts within the ordinary limits, it is clear that when the debt may be tenfold as much, uncertainty is cast upon the precinct's perfection of credit.

If the plaintiff's property were worth much more than its claimed value and the property liable for its payment had a much smaller valuation, the invalidity of a rule that municipal credit is always to be taken for granted would be more strikingly apparent. The suggestion serves to show that the issue in each case is one of fact and degree and demands attention to other items of relevance besides the public character of the taker and its present solvency. They are not by themselves decisive.

It is not expected that the plaintiff will be obliged to pursue such a prospective course in seeking and obtaining payment as has been outlined, if it should be subjected to deferred payment. A defeatist attitude is not taken. But if in 1874 the fact that no town of the state had ever failed to pay its debts was convincing evidence to the court in *Orr* v. *Quimby, supra,* that no town ever would fail, to-day the past is less indicative of the future than it was then. In the present state of affairs foresight of the future is without assurance in the minds of men in general. And it may be noted that municipal incurrence of debt has become an increasing practice.

The conclusion is that the claim for payment cannot legally be proved to be worth its future determined amount. Receipt of full compensation is sufficiently doubtful to prevent a reasonably certain finding of it. A finding that the claim is worth its finally adjudged amount cannot be sustained under the test of proof required to characterize and support it. The chance of failure in some measure of payment in full is of too serious moment to admit of the degree of certainty required for its disregard. In practical thought, no one would now bind himself to pay the full amount of the claim upon its determination, considering it an investment as compared with a speculation. He would ask for some discount.

It is not intended to declare any rule by which payment by the state may be doubtful. When the state takes real property by eminent domain, title vests as soon as the survey and application for assessing the damages are filed. P. L., c. 19, s. 20. The governor with the advice and consent of the council is authorized to draw his warrant upon any money appropriated for the purpose. *Ib.*, s. 27. There being an adequate appropriation, proceedings to condemn are in order. The state's faith and credit then clearly suffice to establish certainty of payment. Regardless of judicial power by mandamus to compel an executive officer to take action upon his refusal to perform his duty to act (*Attorney-General* v. *Taggart*, 66 N. H. 362, 371), the court is bound to presume in advance that the duty will be performed. "The presumption of law is, that the State will keep its faith inviolate, and honestly fulfill all its obligations." *Talbot* v. *Hudson*, 16 Gray 417, 432. The presumption exists because there is reasonable certainty of performance.

No departure from authority is hereby taken, unless in holding that the conclusion of reasonable certainty of payment is to be reached by a range of consideration free from fettering rules of presumption which may operate to displace facts. In *Littleton* v. *Company*, 73 N. H. 11, a statute was construed to require the filing of a bond before there might be a compulsory taking. The case is not here an applicable precedent. In *Roberts* v. *Company*, 73 N. H. 121; *Spencer* v. *Company*, 78 N. H. 468 and *Newmarket Electric Co.* v. *Chase*, 79 N. H. 280, municipal powers were not before the court. But in all of these cases the rule of invalidity when taking precedes payment is expressed as normal and primary, if subject to exceptions. It is said in the *Roberts* case (*p.* 121) that payment or its tender is prerequisite "to the compulsory acquisition of private property for public or *quasi* public purposes." In the *Newmarket Electric Co.* case is the statement (*p.* 284): "The trend of all our decisions is that in such cases payment, or its equivalent, must be made in advance of the acquisition of the desired rights." The mention of the equivalent of payment shows that municipal bodies were in mind. With the exception in their favor relative thereto, the notion of uniformity of treatment prevails.

In none of our cases is it held that a municipality is legally entitled to credit merely by reason of its public nature. Nor does any of them hold that a presumption of credit is to be thereby made. By way of *dictum*, it was said in *Ash* v. *Cummings*, 50 N. H. 591, 621, with approval also as *dictum* in *Orr* v. *Quimby, supra*, 594, that the state or a subdivision of it may take without paying or securing com-

pensation in advance if a certain and expeditious way of ascertaining and recovering it is furnished, "because there the presumption and the fact are that these municipalities are always responsible." As a fact, responsibility of all municipalities cannot be judicially asserted in this present period. As a presumption, giving the effect of a conclusion disregarding the fact, it tends to subvert rather than support the constitution. The reasoning of the *dictum* is unacceptable. Each municipality stands upon its own merits.

*Injunction decreed.*

All concurred.

---

ON REHEARING. After the foregoing opinion was filed the defendants moved for a rehearing.

*Demond, Woodworth, Sulloway & Rogers,* for the motion.

ALLEN, J. One ground assigned for the motion relates to the direction that the superior court grant an injunction. The position is taken that the precinct should not be enjoined from acquiring the plaintiff's property by eminent domain if payment is not postponed to the taking, and that therefore the proceedings for the public service commission to determine the value of the property should be allowed to go forward.

Such a course of action would be in conflict with the statutory order of procedure. It is the mandate of the statute (P. L., c. 44, s. 11) that "As soon as practicable, but not exceeding one hundred and twenty days after the final vote" to take the property, the "utility shall surrender, and the municipality shall take possession" thereof "and thereafter shall operate" it. And that upon the change of possession or as soon afterwards as practicable the utility shall transfer title to the property, the proceedings to determine the amount of compensation to "thereafter proceed to a conclusion."

It is plain that compliance with these requirements in conformity with the decision is impossible. In point of fact the time limits for taking possession and title have long since passed, but assuming this to be due to the pendency of the litigation, yet they must continue to be disregarded if the taking is to await the determination of value. Since by the decision payment may not be postponed to the taking, and since by the statute the taking, as to possession at least, must be

within one hundred and twenty days after the vote, and since the amount of compensation is not determinable within such a period of time, it would come to nothing to proceed to have the value ascertained. The statute excluding cases where postponed payment is unsecured, it follows that further proceedings under the vote would be vexatious, unauthorized and null.

The precinct has not by any vote waived the time limits for taking possession and title. Nor may it waive them without the plaintiff's consent. The phrasing of the statute shows clearly that a municipality is not to be allowed to take its time in carrying out its vote to acquire when it acquires by eminent domain. The statute evidences a purpose that action in pursuance of the vote shall be prompt. The chance of change in the character of the operation of the utility and in its maintenance through delay is sought to be avoided. There is no provision for postponement of taking if value may not be determined within the time limits for taking. As to possession, the limits are definitely fixed for all cases, and with a definite reference to those where payment is postponed. To entitle the precinct to take further action in pursuance of the vote, it would be necessary to add to the statute a clause providing that in cases where payment may not be postponed to the taking of possession or title, the taking may await the payment. The statute may not be read as though it contained such a clause. To hold that it might would be attempted legislation, and not construction.

It is said in the argument in support of the motion that there is statutory authority for taking the plaintiff's property by some alternate procedure of condemnation. No reference to any has been specified and none is found.

The direction that an injunction be granted in the superior court requires one adopting the conclusions of the opinion. It does not call for the imposition of an order restraining the precinct from acquiring the plaintiff's property in ways and by methods duly authorized by legislation. It does demand that the plaintiff be given injunctive relief against any effort of the precinct to acquire its property by eminent domain while there is, as now, reasonable uncertainty of the precinct's credit and while, in the continuance of the uncertainty, legislation fails to provide for payment by the time of taking.

The result is that there is no occasion to consider the other ground of the motion. Any conclusion about it would be *dictum*.

*Former order affirmed.*

All concurred.